## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

TYRESE D. WHITE,

              Plaintiff,

vs.

COMMISSIONER OF SOCIAL SECURITY,

              Defendant.

CASE NO. 5:23-CV-01826

MAGISTRATE JUDGE AMANDA M. KNAPP

**MEMORANDUM OPINION AND ORDER**

Plaintiff Tyrese D. White ("Plaintiff" or "Mr. White") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") decision denying Supplemental Security Income ("SSI"). (ECF Doc. 1.) This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter is before the undersigned by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF Doc. 7.)

For the reasons set forth below, the Court **VACATES AND REMANDS** the Commissioner's final decision, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this opinion and order. On remand, the ALJ should consider the entire record relating to Plaintiff's mental impairments, including the medical, educational, and vocational records, should accurately discuss the evidence, and should ensure that his rationale builds an accurate and logical bridge between the evidence and the result.

### I.      Procedural History

Mr. White received SSI disability benefits as a child with an onset date of March 20, 2007. (Tr. 19, 126-27.) Mr. White's eligibility for SSI benefits was redetermined after he

attained the age of 18.  (Tr. 19.)  He alleged he was still disabled due to ADHD, cognitive and learning problems, and post-concussion syndrome.  (Tr. 130, 152.)  On May 9, 2019, the Social Security Administration ("SSA") found on redetermination that Mr. White did not meet the criteria to be found disabled as an adult.  (Tr. 19, 110-24, 130-36.)  This determination was upheld upon reconsideration on October 22, 2019.  (Tr. 19, 148, 149-58, 159-64.)

Mr. White requested a hearing (Tr. 167-70), and a video hearing was held before an Administrative Law Judge ("ALJ") on May 25, 2022 (Tr. 19, 59-103).  The ALJ issued an unfavorable decision on June 20, 2022, finding Mr. White's disability ended on May 9, 2019, and he had not become disabled again since that date.  (Tr. 16-58.)  The Appeals Council denied Mr. White's request for review of the ALJ's decision on July 18, 2023, making the ALJ's decision the final decision of the Commissioner.  (Tr. 8-13.)  Mr. White then filed the pending appeal.  (ECF Doc. 1.)  The matter is fully briefed.  (ECF Docs. 8, 11, 12.)

## II.    Evidence

### A.    Personal, Educational, Vocational, and Medical Evidence[1]

Mr. White was born in 2001 (Tr. 48) and lived with his mother and two adult siblings. (Tr. 69.)  He has a high school education (Tr. 48, 70) and no past relevant work (Tr. 48, 94).

Mr. White was in a car accident in May 2016.  (Tr. 714.)  He suffered a whiplash injury and complained of headaches following the accident but was not diagnosed with a concussion. (*Id.*)  On August 22, 2016, Mr. White underwent a neuropsychological evaluation conducted by Erica Krapf, Ph.D., at Akron Children's Hospital (Tr. 831-40) "to determine the cognitive and behavioral impact of a history of premature birth and staring spells" and "to assess symptoms associated with Autism Spectrum Disorder" (Tr. 831).  He was 15 years old at the time.  (*Id.*)

---

[1] Each party's summary of the evidence includes evidence prior to, during, and after 2019—the year in which the redetermination was made.

Dr. Krapf noted that Mr. White had "a long history of attention, learning, behavior, and social problems" with prior diagnoses of attention-deficit / hyperactivity disorder, oppositional defiant disorder, and mild intellectual disability.  (*Id*.)  Mr. White was diagnosed with: mild intellectual disability; neurocognitive disorder; history of premature birth and perinatal concerns; staring spells; ADHD, combined presentation; and oppositional defiant disorder.[2]  (Tr. 835.)  Dr. Krapf noted that Mr. White was participating in therapy through the Blick Center; she encouraged him to continue with therapy, observing that he would benefit from therapy and assistance with transition services as he reached adulthood.  (*Id*.)  Given Mr. White's mild intellectual disability, Dr. Krapf indicated he would "have difficulty making complex decisions and managing activities of day-to-day living, and he [would] likely require guardianship to ensure his safety when he turn[ed] 18."  (*Id*.)  Dr. Krapf also recommended a re-evaluation prior to Mr. White turning 18 years of age "to continue to monitor his cognitive development and provide updated recommendations regarding school and job planning as he enter[ed] adulthood."  (Tr. 836.)

In January 2017, Mr. White applied for services through the Ohio Department of Developmental Disabilities.  (Tr. 788.)  He was found eligible for services, with the following diagnoses noted: mild mental retardation, IQ 62; attention deficit / hyperactivity disorder; mild intellectual disability; and neurocognitive disorder.  (*Id*.)

Beginning prior to 2017, Akron Public Schools found Mr. White eligible for an Individualized Education Plan ("IEP") (*e.g.,* Tr. 705-24, 841-60, 920-37) and Behavior Intervention Plan (Tr. 408) based on his intellectual disability (*e.g.,* Tr. 721).  His February 2017 Evaluation Team Report ("ETR") noted that he exhibited "significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and significantly

---

[2] Dr. Krapf noted that Autism Spectrum Disorder had been "[r]uled out" as a diagnosis.  (Tr. 835.)

below average academic skills that adversely affects educational performance." (Tr. 722.) The ETR documented the following cognitive testing scores, from the August 2016 evaluation by Dr. Krapf: full-scale IQ of 64, verbal comprehension index of 73, visual spatial index of 67, fluid reasoning index of 69, working memory index of 69, and a processing speed index of 60. [3] (Tr. 705, 837.) The ETR also documented the following adaptive functioning testing scores from August 2016: 65 in general adaptive composite (low), 69 in conceptual (low), 59 in social (low), and 70 in practical (borderline); overall, the scores were characterized as demonstrating "significant adaptive deficits in the conceptual, practical, and social areas of measurement[.]" (Tr. 711, Tr. 839-40.) Mr. White's "global adaptive ability" was in the "low range." (Tr. 711.)

In October 2017, Mr. White was notified by a Vocational Rehabilitation Counselor with Opportunities for Ohioans with Disabilities ("OOD"), Karen Kriss, that he was eligible for vocational rehabilitation services, and she would be meeting with him to discuss and create an Individualized Plan for Employment ("IPE"). (Tr. 745-49.) Ms. Kriss informed him that his "priority category" for vocational rehabilitation was "Most Significantly Disabled" and that OOD had determined that his disability seriously limited him in the following areas: self-direction, interpersonal skills, and work skills. (Tr. 745.)

Mr. White presented to Rebecca Hutchins, LISW, at the Blick Center on February 20, 2018, for a diagnostic assessment update. (Tr. 812-19.) The update noted that he continued to struggle with social skills, communication skills, and interpersonal skills, and had ongoing issues at school and at home; but he showed some progress with respect to instigating conflict with his siblings and his peers, and with communicating his thoughts and feelings. (Tr. 818.) He also

---

[3] Prior testing showed full-scale IQ scores of 62 in 2007, 67 in 2010, and 70 in 2014. (Tr. 705, 833).

showed a slightly increased amount of willingness to participate in therapy.  (*Id.*)  LISW Hutchins recommended that Mr. White continue with monthly individual therapy.  (Tr. 819.)

On January 17, 2018, Mr. White's IPE listed heating and air conditioning mechanics as his "employment outcome." (Tr. 751-55.)  His projected date to reach his employment outcome was January 2021 and the steps to reach his employment goal included: continuing to attend school to obtain his high school diploma and increase his work readiness; summer youth work experience (SYWE); transportation; job search, placement, and development assistance; and on-the-job support / job coaching. (Tr. 751.)

In his April 2018 IEP, completed while he was in the tenth grade, it was noted that Mr. White had problems following directions and requests from authority figures, which could be perceived as acts of defiance; he was also noted to stare blankly, which gave the appearance that he was not listening, understanding, or was disinterested or attempting to manipulate information.  (Tr. 841.)  Mr. White was noted to be disruptive to other students in the classroom, sometimes responding to a classmate's negative behavior toward him but sometimes initiating the negative behavior.  (Tr. 844.)  He was in core classes but received interventions in the areas of ELA, math, vocabulary, behavior, and speech therapy; some intervention services were provided in a separate classroom within his regular school.  (Tr. 843, 854-57.)

During the summer of 2018, Mr. White participated in the SYWE through the Summit County Developmental Disabilities Board ("Summit DD"), painting fire hydrants.  (Tr. 454-65.)  After the initial two weeks, Mr. White's work was summarized as follows:

> He does a good job.  Works at his own pace, has issues staying on task and not being completely productive.  Tends to be on cell phone while on work time, had to be prompted to get back in the routine.  Once he learns a task, it takes him a few times to practice it and perfect it.

(Tr. 459.)   After Mr. White's next two weeks of painting fire hydrants, his work was

summarized as follows:

> Works at his own pace, still has issues staying on task and not being completely
> productive. Continuing to work on him not using cell phone while working and he
> had to be prompted to get back in the routine. Continues to learn the tasks, it takes
> him a few times to practice it and perfect it.

(Tr. 465.)

In March 2019, Mr. White presented to Ms. Hutchins at the Blick Center for a diagnostic

assessment update.  (Tr. 1122-30.)  He was 18 years of age at the time and in the eleventh grade.

(Tr. 1122.)  Ms. Hutchins indicated that Mr. White was originally referred to address physical

and verbal aggression and impulsive behavior.  (*Id*.)  She stated that Mr. White had demonstrated

improvement in these areas, but still struggled showing appropriate social skills and impulse

control.  (*Id*.)  His diagnoses were: oppositional defiant disorder; attention-deficit hyperactivity

disorder, other type; and mild intellectual disabilities.  (Tr. 1128.)  Although Mr. White had

turned 18 years old, he requested that his therapist continue to include his mother in the therapy

process and decisions regarding school.  (Tr. 1129.)

At the time of his April 2019 IEP (Tr. 920-37), Mr. White was in eleventh grade and was

participating in the Global Technology Academy with HVAC as part of his pathway (Tr. 921).

He was described as "very capable and in many ways a typical . . . high school student" and "a

social person."  (Tr. 921.)  It was observed that Mr. White had "the ability to be successful."

(*Id*.)  However, it was noted that when he had "demand on his performance or [was] required to

complete academic tasks, . . . he often [chose] not to perform or participate."  (*Id*.)  It was also

noted that Mr. White did not participate in Google classroom for ELA or math and, "[a]ccording

to teacher observation, he often start[ed] the school year strong, but as the spring season [came]

he often shut[] down with little or no effort given to sustain academic progress."  (*Id*.)  When

6

Mr. White was on task, it was observed that he finished the task "extremely fast often providing superficial information or doing the minimum amount of work needed to be considered done." (*Id.*)  In math, Mr. White could add single digit numbers but was less than twenty-percent accurate with multiplication.  (*Id.*)  He struggled to write out a check accurately.  (*Id.*)  He could identify coins, but struggled making change.  (*Id.*)  In ELA, Mr. White struggled with and continued to need support with reading comprehension.  (Tr. 921, 927.)  He struggled writing comprehensive paragraphs and often omitted correct punctuation, grammar, and word choices. (Tr. 921-22.)  He rushed through his work, hoping to finish early.  (Tr. 922.)  He did not like to read aloud and had recently started to refuse to do so when asked.  (*Id.*)  With respect to Mr. White's behavior, it was noted that he walked out of the classroom at times and his refusal to put his phone away during classroom instruction was negatively affecting his academic progress and cooperation.  (Tr. 922, 929.)  Accommodations and intervention services were recommended in the areas of reading, math, language, and behavior.  (Tr. 931-32.)  Mr. White was exempted from the Third Grade Reading Guarantee and was eligible to participate in the Alternate Assessment for Students with Significant Disabilities (AASCD),

> because he has a significant cognitive disability, has goals and instructions linked to the Ohio Learning Standards-Extended and he requires extensive repeated individualized instruction and support that is not of temporary or transient nature and uses substantially adapted materials and individualized methods of accessing information in alternative ways to acquire, maintain, generalize, demonstrate, and transfer skills across multiple settings.

(Tr. 935.)  The IEP team noted that Mr. White's post-secondary goals included: working with local agencies after he graduated from high school to assist him in obtaining additional training opportunities to support his goal of working in the community; and working full or part time in the community with supports.  (Tr. 924-25.)

Mr. White continued to receive vocational services from 2019 through at least 2022. (*See generally* Tr. 415-21, 511-56, 596-603, 608-83, 699-703, 1078-85.) In the summer of 2019, Mr. White again participated in the SYWE Program, working at a retail store. (Tr. 415-21.) At the conclusion of the program, Mr. White's employer commented that Mr. White: "made a fair amount of progress during this experience"; completed tasks in a timely manner, but was "not always thorough, but [could] be redirected to pay close attention to details"; needed "consistent reminders to handle merchandise carefully, and to stay off cell phone while working"; got "fatigued while working and often [sat] down to complete tasks, even if it [was] not the most efficient way to do it"; was "willing to learn new things and never refuse[d] a task"; and, if he remained "focused and enjoy[ed] what he [was] doing, he [did] really well working." (Tr. 420.) It was also noted that:

> [Mr. White] appear[ed] ready to seek community employment. [He] would benefit from access to a Job Development Coordinator who could assist him with job seeking skills and looking for employment. Once a job is secured he would benefit from access to a Job Coach whom could assist him with reminders not to use his cell phone and handling things carefully. He would also benefit from retention.

(*Id*.) Additionally, Mr. White's manager remarked that he liked Mr. White and "if there [were] any available spots he would be interested in possibly hiring him." (*Id*.)

On November 14, 2019, Mr. White presented to Career Assessment Systems, Inc. ("CAS") upon the referral of a vocational rehabilitation counselor with OOD for a comprehensive vocational evaluation. (Tr. 477-50.) The evaluation was completed by Michelle Sinsley, Evaluator, and W. Brad Hale, CVE, ABVE, PVE. (Tr. 477.) Ms. Sinsely met Mr. White at North High School for the evaluation. (Tr. 478.) The following observations were noted: his appearance was casual but presentable for the occasion; he displayed "moderately effective people skills"; he was "slightly uncomfortable initiating and sustaining social

conversations" in the one-on-one setting; he had "difficulty elaborating or answering questions
with any detail"; his body language was "relaxed"; his general demeanor was "overall
cooperative"; and his "overall attitude and mental state toward the evaluation experience was
slightly indifferent." (*Id*.)  During the evaluation, it was further observed that Mr. White: did not
use the opportunity to take breaks; showed some difficulty maintaining focus and concentration
due to being distracted by his cell phone; and declined help with reading and filling out written
information.  (*Id*.)  Based on "the combined results of [the] vocational skills analysis including
observations, interview and case history," Mr. White was described as "functioning at an overall
moderate deficit level, suggesting a relative inability to function independently in most
competitive employment environments at this time." (Tr. 483.)

　　　　To better prepare Mr. White for competitive employment, it was recommended that he
consider a delayed graduation program and enrollment in vocational/technical education training
program to "allow [him] the prospect of developing better work related skills and improve
vocational barrier skill weaknesses . . . to be successfully competitively employed." (Tr. 490-
91.)  Additionally, "before the initiation of a competitive experience," it was recommended that
Mr. White might "benefit from a Work Adjustment Program," which was a "time-limited,
transitional, systematic program" to assist him with "reaching an optimal level of vocational
development . . .." (Tr. 491.)  It was also recommended that Mr. White might "benefit from an
on-the-job training program in a competitive work environment with the support of a job coach"
once it was determined that he was ready for the "competitive workplace." (*Id*.)  Further, it was
noted that he could benefit from development of pre-employment skills such as searching for
active employment opportunities, documentation of employer contacts, submission of job
applications, and resume writing and/or interview experiences. (Tr. 494.)  It was also noted that

he could benefit from a job coach to help him develop employment strategies and to overcome vocational barriers identified as part of the assessment.[4]  (Tr. 495.)

On November 14, 2019, Mr. White received a two-day suspension from North High School for threats of physical attack without a weapon and disruptive behavior.  (Tr. 424-25.) On November 19, 2019, he was charged with aggravated menacing after demonstrating a pattern of bullying and intimidation and verbally and physically threatening behavior, including telling the victim he would kill him. (Tr. 426-31.)  He pled guilty to aggravated menacing on December 10, 2019, and was sentenced to 180 days in jail with 180 days suspended.[5]  (Tr. 432.)  He was charged with intimidation, damaging or endangering, and retaliation on December 13, 2019.  (Tr. 433-38.)  He pled guilty to intimidation and damaging or endangering on January 2, 2020, and was sentenced to 180 days in jail with 162 days suspended and credit for 18 days served on the intimidation charge, and 90 days in jail with 72 days suspended and credit for 18 days served on the damaging and endangering charge.[6]  (Tr. 435.)  The retaliation charge was dismissed.  (Tr. 436-38.)  At the end of January 2020, Mr. White's Summit DD team indicated that it would prepare a report of a Major Unusual Incident (MUI) based on information regarding Mr. White's involvement in the criminal cases, noting that Mr. White's mother suggested Mr. White was the victim but the arrest/police report showed a different picture. (Tr. 671-72.)

---

[4] Identified vocational behavioral skills included: effective communication; following oral and written instruction; following safety instruction; working independently, initiating activities, and asking for help when needed; remembering instructions and task organization; maintaining personal responsibility for materials and tasks; adhering to policies, rules, and schedules; applying acquired skills to learn and perform given tasks; accommodating to changes in environment while maintaining productivity; focusing attention and maintaining performance despite distractions; performing activities at an acceptable rate; consistently doing good quality work on tasks with few errors; remaining emotionally calm under stressful conditions; and displaying consistent, predictable behavior, and adequate self-control.  (Tr. 490.)

[5] His sentence also included a term of probation for six months and a no contact order.  (Tr. 432.)

[6] His sentence on the intimidation charge included a term of probation for six months and a no contact order, and his sentence on the damaging or endangering charge included a restitution order.  (Tr. 435.)

Mr. White was transferred from North High School to Kenmore-Garfield High School following his behavioral incident at North High School. (Tr. 1109.) His IEP was then re-evaluated on January 31, 2020. (Tr. 1106-20.) He was in the twelfth grade and his records for the 2019-2020 school year indicated he had 53 absences, including three days of out-of-school suspension, four days of in-school suspension, 11 days of personal illness, nine tardies, and 26 full or partial unexcused absences. (Tr. 1108-09, 1115.) It was noted that there were no disciplinary problems since Mr. White's transfer to Kenmore-Garfield High School. (Tr. 1109, 1115.) The ETR team determined that Mr. White continued to qualify as a student with a disability who required specially designed instruction under the disability category of intellectual disability due to significant cognitive impairments along with below average adaptive abilities. (Tr. 1118.) The ETR team also determined that the IEP special education supports and services in place were sufficient to meet Mr. White's needs. (Tr. 1115.)

Mr. White started working with job developer Matt Mino at United Disability Services to help find him a job. (Tr. 511-12.) On September 15, 2020, Mr. White participated in a mock interview with his job developer. (Tr. 522.) Mr. White was informed that it was up to him to decide whether he wanted to disclose as part of the interview process whether he had a disability. (*Id*.) Mr. White indicated that he did not want to disclose his disability. (*Id*.) His job developer advised him that it was not a bad idea to be forthcoming with the information because he had additional resources available to him to help him be successful in his career. (*Id*.) Mr. White thereafter submitted job applications and received two requests for interviews. (Tr. 511.) But he did not return messages from Mr. Mino as to his availability for the interviews and his lack of involvement in the process was noted to be "concerning." (*Id*.)

11

On October 29, 2020, Mr. White started a job at Walmart.  (Tr. 515.)  He was excited about the position but reported a lot of frustration with the required computer-based learning. (Tr. 513.)  He walked out of the job on the second day, before completing his shift and without telling anyone.  (*Id.*)  He called Mr. Mino to notify him that he had left, but did not show up for his next two shifts and did not provide Mr. Mino with his schedule until after he failed to show up.  (*Id.*)  Mr. Mino arranged for him to have another opportunity at Walmart with a job coach, but he was very uncooperative and immature and said he did not care about the store's Covid mask policy or cell phone policy.  (*Id.*)  Mr. White's job coach repeatedly told him to stay off his phone and wear his mask above his nose and tried to keep him focused on the computer-based learnings, but Mr. White walked out of the job again without telling his job coach.  (*Id.*)

In November 2020, Mr. Mino noted that Mr. White seemed to want to work, but that there were some questions about his readiness to work given the behavioral issues that had occurred in connection with the Walmart job.  (Tr. 516.)  It was decided that they would continue with the job search; Mr. Mino noted that he would provide more support if another job was secured, and would try to coach Mr. White on proper workplace behavior.  (*Id.*)

On November 2, 2020, Mr. White updated his IPE with a stated employment outcome of stock clerk or order filler.  (Tr. 524-32.)  Services to be provided through United Disability Services included: job seeking skills training and planning; job search assistance; and job retention services once employment was obtained.  (Tr. 526.)

In December 2020, Mr. Mino noted that Mr. White had been "pretty active in his job search," indicating that he had applied for a stocking job at Footlocker on his own.  (Tr. 519.) However, he also noted that Mr. White had not returned a phone call from him about setting up an interview at BJ's, and that he needed to improve on writing down information immediately if

12

he talked to a potential employer.  (*Id*.)  In January 2021, Mr. White submitted 12 employment

applications, but missed two out of four job development meetings.  (Tr. 533.)  Mr. Mino noted

that Mr. White seemed to be open to different types of jobs, but did not do a good job

"expressing what he truly [was] looking for or excited about."  (*Id*.)  In February 2021, Mr.

White told Mr. Mino he had to cancel an interview at Burlington because he did not have

"appropriate clothes for interviews or work."  (Tr. 535, 537.)  Mr. Mino worked with Mr.

White's vocational rehabilitation counselor to obtain authorization to buy appropriate clothes for

interviewing and work.  (Tr. 537.)  Also in February 2021, County of Summit Board of DD

Service & Support Coordinator Beth Loeffler informed Mr. White's mother that he had "grown

in his job search," "now realize[d] he need[ed] assistance in finding a job," and was working

well with Mr. Mino.  (Tr. 675.)  Ms. Loeffler's notes reflect that Mr. White's mother said she

was proud of her son and was interested in helping him live a more independent life.  (*Id*.)

An annual review of Mr. White's Individual Service Plan ("ISP") was conducted in

February 2021 via Microsoft Teams.  (Tr. 568-595.)  Mr. White attended the meeting with his

mother, OOD counselor Raenell May, and United Disability Services job developer Mr. Mino.

(*Id*.)  Mr. White reported that it took him "a long time to process information that is given to

[him]" and he needed one-step instructions.  (Tr. 573.)  He indicated that he had a difficult day

when he did not get his way and when people told him what to do.  (Tr. 573-74.)  He said a

known risk for him was being "very impulsive" and not "always understand[ing] the

consequences of [his] actions."  (Tr. 574.)  He said that he was "pretty good" at waking himself

up for school and activities that he enjoyed, but also said that he overslept at times, so it would

be helpful for someone to check on him to make sure he was up and, if not, to wake him up.  (Tr.

576.)  He said his mother was concerned that he did not always dress appropriately for the

13

weather and was not thorough in taking care of his hygiene or showering, shaving, and brushing

his teeth.  (Tr. 577.)  He said he could use the stove to cook with supervision.  (Tr. 578.)  He

reported that he enjoyed spending time with his family at home and in the community.  (Tr. 584.)

He said he loved to bowl and play basketball.  (*Id.*)  He sometimes walked down the street to buy

junk food but needed someone to drive him if he wanted to go somewhere farther from his home.

(*Id.*)  He went to the grocery store with his mother to shop, but his mother also dropped him at

the store and waited in the car for him to shop on his own with a bank card for items on a list.

(Tr. 585.)  He said his mother felt he did better with a bank card because he did not always count

his change.  (*Id.*)  He said he did not do well with changes in his routine and did better if he was

told when the next activity would occur or what he had to do next.  (Tr. 586.)

The Summit DD team discussed the possibility of a guardianship with Mr. White's

mother, but she said she would like to wait and give Mr. White the chance to mature.  (Tr. 594.)

They also discussed the possibility of a medical power of attorney to help Mr. White with

making medical decisions.  (*Id.*)  Mr. White's mother explained they were in the process of

moving; the team decided it was best to focus Mr. White's job search in the area they would be

moving to.  (*Id.*)  They discussed transportation for Mr. White when he found a job, and his

mother indicated she preferred to drive him due to the pandemic.  (*Id.*)

An annual review of Mr. White's progress with his IPE was conducted in February 2021

by OOD.  (Tr. 557-67.)  His Vocational Rehabilitation Counselor Ms. May indicated he had been

working very hard with his job developer to look for employment and planned to continue with

his job search, with an interest in stock clerk or order filler work that involved autos.  (Tr. 557.)

In March 2021, Mr. White was excited to start a new job at Burlington.  (Tr. 538.)

However, the job fell through due to the results of his background check.  (*Id.*)  Mr. Mino noted

that Mr. White had not told him about three misdemeanor charges on this record.  (*Id.*)  Mr.

White and his mother had reported that Mr. White was a minor when the charges occurred, but

Mr. Mino noted that he was 19 years old at the time.   (Tr. 538, 540.)  Mr. Mino noted that Mr.

White was not willing to discuss the incidents after they were revealed through the background

check; he indicated that the charges could be a problem if Mr. White continued to refuse to talk

about them and develop a plan as to how to address it in the future.  (Tr. 538.)

        In May 2021, Mr. White submitted nine applications.  (Tr. 541.)  However, he was not

checking his emails or following through on assignments given to him by Mr. Mino.  (Tr. 541-

42.)  He also missed an interview due to last minute transportation issues.  (Tr. 542.)

        In June, July, and October 2021, Mr. Mino noted that Mr. White's criminal background

was posing problems for Mr. White with respect to his job search.  (Tr. 544, 547, 551.)  Mr.

Mino was continuing to help Mr. White with his search, and they were looking into "second

chance" employers.  (*Id.*)  In August 2021, Plaintiff missed three of four job development

meetings with Mr. Mino.  (Tr. 549.)

        From November 2021 through January 2022, Mr. Mino noted that Mr. White was not

putting forth much effort towards his job search related tasks and was not showing motivation to

find a job.  (Tr. 553, 555, 596.)  Mr. Mino offered to submit applications with Mr. White if he

was not comfortable doing it himself.  (Tr. 553.)  In January 2022, Mr. Mino noted that finding a

retail job would be hard for Mr. White and he might have "more luck" looking for work as a

dishwasher or other similar type job.  (Tr. 596.)

        On January 21, 2022, Mr. White had his annual IPE review.  (Tr. 604-07.)  Ms. May

noted that Mr. White was working hard with his job developer to look for employment (Tr. 604-

07); but monthly job development tracking reports from around that time reflect that Mr. White

15

showed little motivation in finding a job and had not followed through on contacting individuals for the services he needed (*see e.g.*, Tr. 553, 596).

Also on January 21, 2022, Mr. Mino took Mr. White to open interviews at Rose's Discount Store. (Tr. 597.) Mr. White was dressed appropriately, but he was late in meeting Mr. Mino. (*Id*.) Mr. Mino talked to Mr. White about possibly returning for another interview, but noted that the assistant manager and the condition of the store left a bad impression on him and was not sure it would be a good fit for Mr. White. (*Id*.)

In February 2022, Mr. Mino noted that Mr. White was making no effort to submit job applications to employers on his own. (Tr. 598-99.) Mr. Mino met with Mr. White, his mother, and a vocational rehabilitation counselor on February 10, 2022, and "again asked" that Mr. White "apply to jobs on his own too." (Tr. 599.)

On March 1, 2022, Mr. White met with Scott Brown, his Support Administrator at the County Board of DD, and his mother for his annual ISP review. (Tr. 635.) Mr. White was still working with OOD but said it had been difficult due to his criminal record. (*Id*.) Mr. Brown suggested a clinic at the University of Akron as an option to help with expungement. (*Id*.) Mr. White was interested in moving out on his own, but he wanted to focus first on getting a job. (*Id*.) However, he missed two interviews in early March because his mom had "decided not to take him on the interviews as punishment for not getting his State ID renewed." (Tr. 600.) She felt it would not have looked good for Mr. White to show up for interviews without proper documents in order. (Tr. 602.) Mr. Mino explained that it looked worse for Mr. White to not show up for the interviews. (*Id*.)

Mr. Brown agreed during the March 1, 2022 ISP annual review meeting to reach out to Weaver Industries for possible openings on their landscaping crew (EarthCare) as a way for Mr.

16

White to build work history and earn some extra money.  (Tr. 635.)  An online meeting was held on March 15, 2022, regarding the Weaver Industries work program.  (Tr. 668.)  Those in attendance were Mr. White, his mother, Mr. Brown, and a representative of Weaver Industries. (*Id*.)  Mr. Brown explained that the position at Weaver Industries was part of a work program and did not take the place of a job.  (Tr. 668, 669.)  At an online meeting on March 22, 2022, the team decided Mr. White would participate in a temporary summer work program with Weaver Earth, doing landscaping, to develop real work experience and work-related skills.  (Tr. 602.)

On March 25, 2022, Mr. Mino called Mr. White for their weekly job development meeting.  (*Id*.)  During that meeting, Mr. White reported that he had submitted a job application at Rose's Discount Store while he was shopping there with his mother, and that he was supposed to attend an interview later that day but did not have a ride.  (*Id*.)  Mr. Mino suggested that Mr. White could call Rose's Discount Stores to reschedule the interview for a day when Mr. Mino would be available to take him or could take the bus.  (*Id*.)  Mr. White said he could not take the bus because he did not have a bus pass.  (*Id*.)

On April 5, 2022, Mr. Brown informed Mr. White's mother that Weaver Industries needed copies of Mr. White's State ID and Social Security card for the onboarding process.  (Tr. 669.)  On April 8, 2022, Mr. White told Mr. Mino he had accepted a store associate position at Rose's Discount Store.  (Tr. 608.)  He said he was working 18-24 hours per week, with his duties including recovery, stocking, unloading trucks, and general cleaning.  (*Id*.)  Mr. Mino called Rose's Discount Store to verify Mr. White's employment and to see how he was performing. (*Id*.)  The representative from Rose's Discount Store said he had to follow up and check on Mr. White a lot, and that Mr. White had told him he did not need or want a job coach.  (*Id*.)

On April 20, 2022, Mr. Mino spoke with Mr. White's mother about Mr. White's job at Rose's Discount Store. (Tr. 689.) Mr. White's mother said that Mr. White had been sent home early from work a number of times and was lying to her and his manager about things such as alleged conflicts with his schedule. (*Id*.) Mr. Mino followed up with Mr. White's manager, who confirmed that Mr. White had been insubordinate and would not do what he was asked. (*Id*.) Mr. White's manager said Mr. White did a good job of unloading the truck but could not be relied on because he wandered off. (*Id*.) He said that Mr. White would benefit from a job coach, but Mr. Mino relayed that Mr. White had refused a job coach. (*Id*.) When Mr. Mino spoke with Mr. White about the job, Mr. White reported that the job was going well and he said he had to get off the phone to get to work when Mr. Mino asked him about being sent home early. (*Id*.) Mr. Mino told Mr. White that there was only so much he could do to help Mr. White since he had refused a job coach; if he wanted to keep his job, Mr. Mino told him he would have to "step it up and do what is asked of him at work." (*Id*.) Mr. White was let go from Rose's Discount Stores the following day because he did not call off and did not show up for work on April 21, 2022. (*Id*.) When Mr. Mino called Mr. White on April 29, 2022, to hear his side of the story, Mr. White reported that he was fired because his employer had "changed his schedule without him knowing" and he "didn't have a ride to work" on April 21. (*Id*.)

A few days later, in early May 2022, Mr. White started in the work program at EarthCare through Weaver Industries. (Tr. 683, 689.) On May 6, 2022, OOD notified Mr. White that it was closing his case because he was no longer interested in receiving their services and was transitioning to another agency. (Tr. 683-89.) More specifically, the notice explained:

> Individual has repetitively lost employment opportunities and has not been able to progress into community integrated employment at this time. It was recommended by both Summit Co. DD and VRC, the individual participate in the Extended Employment Work program, EarthCare to gain further assistance on a longer term

basis to gain the necessary skills to eventually transition into Community Integrated Employment. The individual felt this was a good choice and has successfully transitioned to this program for long term assistance through Summit Co. DD. The individual is aware he can reapply for OOD Services at any time. Case is closing for no longer interested in services due to participation in long term program through another agency.

(Tr. 683.)[7]

## B.  Opinion Evidence

### 1.  Examining Physicians

#### i.  Joshua Magleby, Ph.D.

On April 15, 2019, Mr. White presented to a clinical neuropsychologist Joshua Magleby, Ph.D., for a consultative evaluation.  (Tr. 914-19.)  Dr. Magleby based his evaluation on a psychiatric history and mental status examination of Mr. White and a brief interview of Mr. White's mother regarding past and current functioning.  (Tr. 914.)  No collateral information or records were provided to Dr. Magleby and psychological testing was not requested.  (*Id.*)

When asked the reason for filing for disability, Mr. White responded, "I don't know" and later described having a learning disability.  (Tr. 914.)  Mr. White's mother said he was applying for disability due to "[h]is comprehension and understanding of direction, his impulsivity, and he has a very hard time paying attention."  (*Id*.)  Mr. White and his mother said he needed reminders and help taking care of his personal hygiene; he could not cook or do laundry; he could not use the stove unattended and could barely use the microwave.  (Tr. 916.)  They reported no significant issues with his ability to use public transportation and his ability to manage money, shop, pay bills, and correctly count change was functional.  (*Id*.)

---

[7] The Commissioner cites to evidence regarding Mr. White's participation in the Weaver/EarthCare program that was submitted to the Appeals Council after the underlying ALJ decision was issued.  (ECF Doc. 11, p. 6; *see* Tr. 698.)  That evidence was not part of the evidentiary record before the ALJ and is not considered herein.

On examination, Dr. Magleby observed that Mr. White was dressed appropriately, and his hygiene was fair.  (Tr. 916.)  His behavior was "generally composed and appropriate for the situation," but Dr. Magleby also observed that Mr. White was "easily distracted by pictures or objects in the evaluation room" and "blurted out at times."  (*Id.*)  Dr. Magleby also noted that Mr. White asked if he could play with toys when he first entered the room.  (*Id.*)  Mr. White's "[m]otivation for the exam appeared at least fair."  (*Id.*)

Based on the examination, Dr. Magleby found that Mr. White's "intellect appear[ed] extremely low"; his "memory functions . . . appeared to be fairly commensurate with intelligence, including somewhat impaired short-term verbal recall on MSE"; and his "adaptive behavior [was] estimated to be below average for age expectations, based largely on [his] mother's claims."  (Tr. 918.)

Dr. Magelby diagnosed Mr. White with: intellectual disability, mild; unspecified depressive disorder; and unspecified attention-deficit / hyperactivity disorder.  (Tr. 918.)  Dr. Magleby provided the following opinions regarding Mr. White's functional abilities:

- The claimant's ability to understand, remember and carry out simple oral instructions is adequate compared to other adults the same age based on this exam. On this exam the claimant has clearly shown the ability to follow the examiner's questions and directions, oral instructions on mental status and provide simple appropriate responses. Comprehension seemed more than adequate. Memory appeared fairly adequate overall, though with a history of learning problems that may suggest problems with retaining information. The claimant's ability to follow more complex instructions or directions appeared to be somewhat impaired for age expectations.

- The claimant was not overly distracted on exam and seemed able to follow the procedures. The claimant's ability to maintain attention and concentration seemed adequate at best compared to other adults the same age. Persistence and pace in providing personal information and responses to mental status appeared adequate compared to other adults the same age. The ability to perform a simple repetitive task, based on mental status and history, appeared more than adequate. The ability to perform multi-step

tasks appeared at least somewhat impaired for age expectation. No overt ADHD signs were observed.

- The claimant's ability to relate to others, such as, peers, fellow workers and/or supervisors has been without significant incident. Relationships with co-workers were usually "good", and with supervisors "good". Socially, he claimed feeling "comfortable" around people. However, the mother claimed the claimant has longstanding anger control problems. His social relating during this evaluation was fairly appropriate overall. This is supported by reports of past social adaptive behaviors, past relationships, and current relationship and social history.

- From a psychiatric standpoint, the claimant's ability to withstand the mental stress and pressures associated with day-to-day work activity appears somewhat impaired, mostly by longstanding anger control problems and concurrent mood-related difficulties. This is supported by the claimant's current mental complaints on this exam, psychiatric history and estimated adaptive behaviors at this time.

(Tr. 918-19.)

### ii.    Erica Krapf, Ph.D.

On October 1, 2019, Mr. White presented to Dr. Krapf for a neuropsychological re-evaluation.[8] (Tr. 1001-09.) The re-evaluation "was primarily requested to assist with [Mr. White's] transition to adulthood." (Tr. 1001.) Mr. White's mother reported that she wanted Mr. White to have an opportunity to independently manage his affairs after he turned 18 years of age, but she recently realized he needed more assistance with decision making and was planning to start the guardianship process soon. (Tr. 1002.) She reported Mr. White was unable to complete basic chores correctly and needed regular reminders to complete self-care tasks. (*Id.*) She also thought he was slightly depressed and said that he was less hyperactive but continued to have problems with this attention span, impulsivity, and respecting other people's property. (*Id.*) She expressed concerns about his safety because she felt he did not understand the consequences of

---

[8] Dr. Krapf's neuropsychological evaluation from August 2016 (Tr. 831-40) is summarized in Section II.A., *supra*.

talking back to strangers in the neighborhood, and said he continued to have a hard time making friends.  (Tr. 1003.)  She also reported that his behavior at school had improved, and he rarely fought with his peers or argued with his teachers.  (*Id.*)

During testing, Mr. White was quiet, but maintained adequate eye contact (Tr. 1003), and his cooperation was adequate (Tr. 1004).  He occasionally interjected random comments, but mostly asked about the length of testing and asked for clarification of directions.  (Tr. 1003.)  He only engaged minimally in social conversation and responded to social questions with one-word answers.  (*Id.*)  His affect was generally flat, but he laughed at a few of the examiner's jokes toward the end of testing.  (*Id.*)  He reported that he was very tired in the morning.  (*Id.*)  He was quick to say he did not know the answer to a question but would think about the question for a few more seconds if prompted to do so.  (Tr. 1004.)  He paused for a long time before providing answers and "often approached tasks with an inefficient trial-and-error strategy."  (*Id.*)  There were no clear signs of frustration observed.  (*Id.*)  Mr. White made some grammatical errors when speaking, but his speech was fluent and easily understood.  (*Id.*)  He needed to have directions repeated and clarified when possible.  (*Id.*)

Mr. White's full-scale IQ was 67, with subtest scores ranging from 70 to 76. (Tr. 1007.)  On adaptive function testing, his general adaptive composite was 59, with subtests ranging from 58 to 65. (Tr. 1009.)  Dr. Krapf found Mr. White continued to show "globally impaired cognitive abilities . . . [but with] no evidence of negative changes in cognitive functioning since his previous evaluation, and (although still impaired) he show[ed] a relative improvement in processing speed."  (Tr. 1004.)  Dr. Krapf noted that Mr. White's improvement in processing speed suggested that he had fully recovered cognitively from his concussion in 2017.  (Tr. 1001, 1004.)  She indicated that Mr. White's overall reading abilities were more similar to a third-

22

grade student than a high-schooler. (Tr. 1004.)  Dr. Krapf stated: "Of greatest concern in the context of his status as a legal adult" was that he "continue[d] to have significant difficulty with adaptive functioning (i.e., daily living skills)," noting that Mr. White's mother had indicated that Mr. White's "conceptual, social, and practical adaptive skills [were] significantly delayed when compared to same age peers." (*Id.*)  Dr. Krapf stated further: "The areas of greatest difficulty include[d] functional academics, leisure skills, social abilities, community engagement, and health and safety knowledge." (*Id.*)  She further observed that: "On an objective measure of his adaptive functioning, he demonstrate[d] delayed abilities to manage money, home, and transportation, and his knowledge of health and safety [was] significantly impaired." (*Id.*)

Dr. Krapf diagnosed mild intellectual disability and ADHD, but concluded that Mr. White no longer met the full criteria for a diagnosis of oppositional-defiant disorder. (Tr. 1004-05.)  She also included a diagnosis of neurocognitive disorder and noted a history of premature birth and perinatal concerns. (*Id.*)

Dr. Krapf recommended that Mr. White continue working with OOD so that he would receive "ongoing job training and support after graduation" which would "help to ensure he has opportunities to gain work skills" (Tr. 1005).  She indicated that Mr. White did "best with concrete instructions and routine, so he will excel with a repetitive job that includes standard work duties." (*Id.*)  She also indicated that "[j]obs that require abstract and speeded processing may result in safety concerns (e.g., working in an automotive shop) and would require long-term supervision and job coaching." (*Id.*)  She also opined that Mr. White would "continue to learn new skills at his own pace but will always be significantly delayed compared to same-age peers"; as a result, she concluded it would be "difficult for him to gain substantial gainful employment that [would] fully support his needs, and he currently ha[d] limited resources." (*Id.*)  Dr. Krapf

encouraged Mr. White's mother to help him appeal the denial of his social security benefits, noting that submission of her report might help support his appeal efforts. (*Id.*) She encouraged the family to explore guardianship or other alternatives so that Mr. White's mother could continue to provide support and assistance to Mr. White as an adult, but also encouraged her to provide Mr. White with "opportunities to practice and learn new adaptive skills." (*Id.*) She encouraged Mr. White to continue counseling at the Blick Center to work on anger management strategies. (Tr. 1006.)

### 2. State Agency Reviewers

On May 8, 2019, state agency psychological consultant Jaime Lai, Psy, D., completed a Psychiatric Review Technique ("PRT") (Tr. 118-19) and Mental RFC Assessment (Tr. 120-23). In the PRT, Dr. Lai opined that Mr. White had mild limitations in his ability to interact with others and moderate limitations in his ability to: understand, remember, or apply information; concentrate, persist, or maintain pace; and adapt or manage oneself. (Tr. 118.) In the Mental RFC Assessment, Dr. Lai opined that Mr. White: could understand, remember, and carry out instructions to complete 1-3 step simple routine tasks; would likely have difficulty sustaining more complex tasks over the course of a normal workday / workweek; could maintain adequate concentration, persistence, and pace to carry out 1-3 step routine and repetitive tasks in a setting without fast paced performance demands or high production quotas; and could perform jobs that did not involve fast pace or high production standards in a fairly static setting where changes were infrequent and could be easily explained beforehand. (Tr. 121-22.) On July 26, 2019, state agency psychological consultant Cynthia Waggoner, Psy.D., reviewed the record and affirmed Dr. Lai's findings. (Tr. 993, 999.) The medical records reviewed by Dr. Lai included Mr. White's 2016 neuropsychological evaluation and cognitive testing (Tr. 117, 122-23), but both

state agency psychological consultant opinions predated Dr. Krapf's October 2019

neuropsychological reevaluation and cognitive testing (Tr. 1001-09).

C.      **Hearing Testimony**

Testimony from Mr. White, his mother Kristina Clark, Matthew Mino, and the vocational

expert from the May 25, 2022 video hearing is summarized below.

1.      **Plaintiff's Testimony**

Mr. White testified in response to questioning by the ALJ and his representative.  (Tr. 69-

79.)  Mr. White did not have a driver's license.  (Tr. 70.)  His mother drove him to appointments

and places where he needed to go.  (*Id.*)  He graduated from high school in 2020 and reported he

could read, write, and make change for a $20.00 bill.  (Tr. 70-71.)  He reported that he was

working a landscaping job at Weaver; he worked about five hours per day but could not say how

much he made per hour.  (Tr. 71.)  There were approximately six workers on the job site at

Weaver and two supervisors.  (Tr. 77-78.)  His supervisors showed him how to do things and he

was picked up for work and taken home by Weaver.  (Tr. 78-79.)

Mr. White said he was recently let go from a job at Rose's Discount Store.  (Tr. 76-77.)

He worked there for about three weeks, and said he had trouble knowing his schedule and

knowing when to be at work; he had called off because he was sick.  (Tr. 77.)  He said he was

not told why he was terminated from the job at Rose's Discount Stores.  (Tr. 76-77.)  He did not

recall working at Walmart.  (Tr. 77.)  He reported never holding a job on a full-time basis.  (Tr.

71.)  He said he did not know what prevented him from working a full-time job.  (*Id.*)

The ALJ asked Mr. White whether he experienced symptoms of crying spells, mood

swings, lack of motivation, fatigue, or memory loss due to his depressive order.  (Tr. 71-72.)  Mr.

White responded that he did not know.  (Tr. 72.)  The ALJ inquired about his diagnosis of

oppositional defiant disorder and asked Mr. White if he had disciplinary issues while in school. (*Id*.)  Mr. White admitted that there were disciplinary issues and admitted he had been suspended or expelled, primarily due to fights; he could not recall how many times.  (*Id*.)  He denied getting into fights any longer, but admitted to having anger issues at his current job.  (*Id*.)

Mr. White reported that he could complete chores that his mother asked him to do, such as laundry and washing the dishes.  (Tr. 73.)  He also reported issues with his concentration and memory, explaining that he could follow one-step instructions, but it was difficult for him to remember things if he was asked to do multiple things at once.  (Tr. 73, 75-76.)  He also said that his mother had to remind him to do things.  (Tr. 75-76.)  He reported that he did not use computers.  (Tr. 76.)  On a typical day, if he was not working, he played video games, watched television, and slept.  (Tr. 73-74.)  He reported that he had no friends and no activities or hobbies outside of the home.  (Tr. 74.)

### 2.    Kristina Clark's Testimony

Kristina Clark testified in response to questioning from the ALJ and Mr. White's representative.  (Tr. 79-87.)  She testified that Mr. White's grades while in school were better when he was in junior high than in high school.  (Tr. 80.)  His grades in high school were Cs, Ds, and some Fs, and he had an IEP.  (*Id*.)  She said his IEP accommodations included extended time on tests, reduced questions on tests, one-step directions, and multiple explanations or different ways of explaining things.  (*Id*.)  She also said he had disciplinary issues in high school, including issues with staff and students that resulted in several suspensions and one expulsion that required him to transfer to a different school.  (Tr. 81.)  The expulsion stemmed from an allegation that he threw a rock at someone's car window on his way home from school.  (*Id*.)  In addition to the expulsion, the incident led to his criminal charges.  (*Id*.)

Ms. Clark reported that she attended all of Mr. White's medical appointments with him. (Tr. 81.)  Mr. White was not on any medication for his behavioral health issues.  (*Id.*)  He had been on ADHD medication in the past, but Ms. Clark took him off the medication when he was about ten years old due to side effects, which she said included "weight loss, things of that nature."  (*Id.*)  Ms. Clark said that Mr. White attended counseling in the past, but he chose to stop attending when he turned 18 years old.  (*Id.*)

Ms. Clark testified that Mr. White had issues following through on chores at home.  (Tr. 82.)  She had to give him reminders even for simple things, like locking the door and turning off lights.  (*Id.*)  She said Mr. White and his siblings got along fairly well now that they were older.  (*Id.*)  In addition to enjoying video games, she said Mr. White liked to play basketball with his brother; usually just the two of them played, and they played near their home.  (Tr. 82-83.)

Ms. Clark was asked about Mr. White's job at Walmart.  (Tr. 83.)  She said that Mr. White's inability to recall working there could be related to the fact that he was only there for about two days.  (*Id.*)  She testified he was there in 2019 or 2020, and that the job ended because the new-hire onboarding had to be completed on the computer and Mr. White could not complete it even with the assistance of a job coach.  (Tr. 83-84.)  She reported that Mr. White "got extremely frustrated and quit."  (*Id.*)

With respect to Mr. White's job at Rose's Discount Store, Ms. Clark said that he was unable to keep track of his schedule, called off twice, and had some conflict with his supervisor.  (Tr. 84-85.)  He was ultimately let go from the job in early 2022.  (*Id.*)

Ms. Clark also testified regarding Mr. White's current job at Weaver.  (Tr. 85.)  She reported that she recently attended a meeting to address some issues that Mr. White was having with following directions and safety procedures, like remembering to put on his safety goggles.

27

(Tr. 85-86.)  At the meeting, they also addressed: the fact that Mr. White had called off work, once because he was sick and once because his arm hurt; racially discriminatory comments that were directed at Mr. White by a coworker; and an incident when Mr. White cursed at work.  (*Id.*)  Ms. Clark testified that Mr. White had been off work for about one week, until the meeting was held to address the noted issues.  (Tr. 86.)

Ms. Clark testified that Mr. White had "a really hard time with social skills, as well as communication and understanding."  (Tr. 87.)  She said he had "a hard time with self-awareness," which was something he needed to work on so he could be "a little more successful in the world."  (*Id.*)  As to Mr. White's ability to act appropriately in the workplace and at home, Ms. Clark said there were "just some things that, you know, he doesn't know," like not cursing at work, not knowing how to properly address people, and "[b]eing able to understand that when you're at work there's different rules than there is at home, things of that nature."  (*Id.*)

### 3. Matthew Mino Testimony

Matthew Mino testified in response to questioning by the ALJ and Mr. White's representative.  (Tr. 87-93.)  Mr. Mino explained that he had been working as Mr. White's job developer for about two years, up until May 5, 2022.  (Tr. 88.)  He said his role was to help Mr. White find a job in the community.  (*Id.*)  He usually met with Mr. White at least once a week.  (*Id.*)  Mr. Mino reported that he had stopped working with Mr. White at Mr. White's request after he obtained the position with Weaver Industries.  (Tr. 88-89, 92.)  Mr. Mino said that Mr. White opted to have his job development case closed so he could focus on the position at Weaver and develop some skills there.  (Tr. 89.)

When Mr. Mino was working with Mr. White, they worked on job search skills.  (Tr. 89.)  For instance, he would ask Mr. White to make a list of businesses near him where he might be

interested in working and they would do practice interviews.  (*Id.*)  Mr. Mino would also attend interviews with Mr. White if allowed to do so, submit job applications on Mr. White's behalf, and make follow-up phone calls for him.  (*Id.*)  If Mr. White was employed somewhere, Mr. Mino would communicate with the manager and serve as an additional point of contact for Mr. White at that job.  (*Id.*)

Mr. Mino testified regarding some difficulties he had in trying to assist Mr. White with securing and maintaining employment, including issues establishing a regular meeting time and keeping scheduled meetings.  (Tr. 89-90.)  Mr. Mino explained that there were "things [that] happened on both [of] [their] ends."  (Tr. 90.)  He also said Mr. White did not use a computer, was not good at managing the Gmail account that Mr. Mino had set up for him, and missed about a dozen interviews that were scheduled over a year or two.  (*Id.*)  Mr. Mino also said Mr. White's background was a barrier to employment when a background check was processed.  (*Id.*)

Mr. Mino testified that Mr. White had walked off his job at Walmart twice and was let go from Walmart.  (Tr. 90-91.)  He said Mr. White did not walk off his job at Rose's, but there was a lot of confusion with scheduling that led to Mr. White being let go from Rose's.  (Tr. 91-92.) He said that Mr. White transitioned from United Disability Services to Weaver Industries because the team was running into a lot of problems getting Mr. White into a job because of his background and behavioral issues.  (Tr. 92.)  The team felt Weaver Industries would provide Mr. White with an opportunity to get some work experience, and "work on some things, kind of just show and prove that he could be employable."  (*Id.*)  He said that Mr. White did not have a successful work attempt during the two-year period that he worked with him.  (Tr. 92-93.)

### 4. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  (Tr. 93-101.)  The ALJ explained to the VE that he had determined there was no past relevant work.  (Tr. 94.)  The ALJ then asked the VE whether there was work in the national economy that a hypothetical individual with the following nonexertional limitations could perform: he could perform only simple, routine and repetitive tasks; he could not perform tasks that required a high production rate pace, such as assembly line work; he could make only simple work-related decisions and should not be responsible for the safety or welfare of others; he could interact frequently with supervisors, but only occasionally and superficially with coworkers, and only on an incidental and superficial basis with the general public, with superficial meaning no sales, arbitration, negotiation, conflict resolution, or confrontation and no group, tandem or collaborative tasks, as well as no management, direction or persuasion of others; and he could respond appropriately to only occasional change in a routine and relatively static work setting, and those changes would need to be easily explained and/or demonstrated in advance of gradual implementation.  (Tr. 95.)  The VE testified that the following medium, unskilled jobs would be available to the described individual: cleaner II, industrial cleaner, and store laborer.  (Tr. 95-96.)

For his second hypothetical, the ALJ asked the VE to assume the first hypothetical but with no interaction or contact with coworkers or the general public.  (Tr. 96.)  The VE testified that the limitation of no interaction with coworkers would be work preclusive.  (*Id.*)

For his third hypothetical, the ALJ asked the VE whether there would be jobs available if the individual needed occasional redirection from supervisors.  (Tr. 96.)  The VE testified that needing occasional redirection would also be work preclusive.  (*Id.*)

The VE also testified regarding allowable off task time and rates of absenteeism, saying it would be work prelusive to be off task 15% or more of the workday, excluding breaks and lunch, or to be absent one or more days consistently on an ongoing basis.  (Tr. 96-97.)

In response to questioning from Mr. White's representative, the VE testified that it would also be work preclusive for an individual to be frequently distracted by looking at his cell phone (Tr. 99-100), and that the following limitations, either individually or collectively, would eliminate competitive employment: difficulty following oral and written instructions; difficulty working independently; difficulty remembering instructions; difficulty maintaining personal responsibility; difficulty adhering to rules; difficulty acquiring skills to learn the task and focusing attention; difficulty doing the activity at an acceptable rate; difficulty doing quality work; and difficulty with self-control with predictable behavior.[9]  (Tr. 100-01.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

---

[9] When questioning the VE on these limitations, Mr. White's representative was referencing barriers to work identified in Exhibit 25E.  (Tr. 101, *see also* Tr. 490.)

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

The standard for reviewing a claim that a claimant's childhood disability benefits should not have been terminated when the claimant turns 18 years old is the same standard that the SSA uses to evaluate first-time disability claims for adults.  *See Siebert v. Comm'r of Soc. Sec.*, 105 F. App'x 744, 746 (6th Cir. 2004); 20 C.F.R. § 416.987(b).  But the first step of the sequential evaluation is not used for redetermining disability at age 18.  *See* 20 C.F.R. § 416.987(b).

32

## IV.    The ALJ's Decision

In his June 20, 2022, the ALJ made the following findings:[10]

1.    The claimant attained age 18 in 2019 and was eligible for SSI benefits as a child for the month preceding the month in which he attained age 18.  (Tr. 21.)  The claimant was notified that he was found no longer disabled as of May 9, 2019, based on redetermination of disability under the rules for adults who file new applications.  (Tr. 21-22.)

2.    Since May 9, 2019, the claimant had the following severe impairments: neurocognitive disorder, depressive disorder, mild intellectual disorder (ID), oppositional defiant disorder (ODD), and attention-deficit hyperactivity disorder (ADHD).  (Tr. 22-23.)

3.    Since May 9, 2019, the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 23-31.)

4.    Since May 9, 2019, the claimant has had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he can perform simple, routine, and repetitive tasks but no tasks that require a high production rate pace (such as assembly-line work), he can make only simple work-related decisions, and he should not be responsible for the safety or welfare of others.  He can interact frequently with supervisors, but only occasionally and superficially with coworkers and only on an incidental basis and superficially with the general public, with "superficially" meaning no sales, arbitration, negotiation, conflict resolution, or confrontation and no group or tandem or collaborative tasks and no management, direction, or persuasion of others.  Lastly, he can respond appropriately to occasional change in a routine and relatively static work setting, as long as any such changes are easily explained and/or demonstrated in advance of gradual implementation.  (Tr. 31-48.)

5.    The claimant has no past relevant work.  (Tr. 48.)

6.    The claimant was born in 2001 and is a younger individual age 18-49.  (*Id*.)

7.    The claimant has at least a high school education.  (*Id*.)

8.    Transferability of job skills is not at issue because the claimant has no past relevant work.  (*Id*.)

---

[10] The ALJ's findings are summarized.

9.      Since May 9, 2019, considering the claimant's age, education, no work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including cleaner II, industrial cleaner, and store laborer.  (Tr. 48-49.)

Based on the foregoing, the ALJ determined that Mr. White's disability ended on May 9, 2019, and the claimant had not become disabled against since that date.  (Tr. 49.)

## V.      Plaintiff's Argument

Mr. White presents one assignment of error.  He argues that the ALJ's determination that he retained the RFC to perform a range of unskilled work lacks the support of substantial evidence.  (ECF Doc. 8, pp. 1, 20-25; ECF Doc. 12.)

## VI.      Law & Analysis

### A.      Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th

Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.      Sole Assignment of Error: Whether the RFC is Supported by Substantial Evidence**

In his sole assignment of error, Mr. White argues the RFC finding him capable of performing a range of unskilled work lacks the support of substantial evidence because "the ALJ erred in his analysis of the evidence from Plaintiff's schools, vocational services, and examining

neuropyschologist."  (ECF Doc. 8, pp. 1, 21-25; ECF Doc. 12.)  The Commissioner argues in response that the RFC was supported by the medical opinion evidence, and that the ALJ "considered all the evidence Plaintiff cites—evidence which does not unambiguously mandate additional limitations."  (ECF Doc. 11, p. 1.)  Ultimately, the Commissioner argues that Mr. White seeks to have this Court improperly reweigh the evidence.  (*Id.* at pp. 1-2.)

A claimant's RFC "is the most [he] can still do despite [his] limitations."  20 C.F.R. § 416.945(a)(1).  An ALJ is charged with assessing a claimant's RFC "based on all the relevant evidence in [the] case record."  *Id.*; *see also* 20 C.F.R. § 416.946(c) "(If your case is at the administrative law judge hearing level . . ., the administrative law judge . . . is responsible for assessing your residual functional capacity.");  *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) ("The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician.").

Here, the ALJ concluded that Mr. White had the following mental RFC:

he can perform simple, routine, and repetitive tasks but no tasks that require a high production rate pace (such as assembly-line work), he can make only simple work-related decisions, and he should not be responsible for the safety or welfare of others.  He can interact frequently with supervisors, but only occasionally and superficially with coworkers and only on an incidental basis and superficially with the general public, with "superficially" meaning no sales, arbitration, negotiation, conflict resolution, or confrontation and no group or tandem or collaborative tasks and no management, direction, or persuasion of others.  Lastly, he can respond appropriately to occasional change in a routine and relatively static work setting, as long as any such changes are easily explained and/or demonstrated in advance of gradual implementation.

(Tr. 31.)  In support of this RFC, the ALJ considered Mr. White's subjective statements and reports regarding his activities of daily living (Tr. 22-30, 32-33, 42-43), his medical treatment records and objective clinical findings, including cognitive test results (Tr. 24, 27-30, 33-37), his

education records, including IEP reports (Tr. 25, 27-29, 37-40), his vocational development and

job coaching records (Tr. 25-26, 28-29, 40-42), and the medical opinion evidence (Tr. 43-47).

Mr. White argues that the RFC lacks the support of substantial evidence because the ALJ

"erred in his evaluation of the neuropsychological, educational, and vocational evidence of

record, as well as the witness testimony at the hearing," and made "mistakes and omissions in his

analysis." (ECF Doc. 8, p. 21.) Specifically, he argues that the ALJ: (1) erred in citing to

evidence predating the disability cessation date as evidence of non-disability (*id.* at p. 21); (2)

failed to appropriately support his finding that Mr. White could perform competitive work

despite "extremely low intelligence and extremely limited adaptive functioning" because he

failed to address or reconcile certain evidence (*id.* at pp. 21-22); (3) erred in his evaluation of the

vocational evidence, finding sheltered work experiences supported an ability to perform

competitive work and mischaracterizing a sheltered work program as competitive work (*id.* at

pp. 22-24); and (4) failing to appropriately account for the fact that all of the professionals who

serve Mr. White recommend continued supportive services, and that none have suggested that

his limitations "are volitional or unrelated to his underlying diagnoses" (*id.* at p. 24).

The Commissioner argues in response that the ALJ's findings were supported by the

medical opinion evidence (ECF Doc. 11, pp. 8-9), that the ALJ considered much of the evidence

discussed in Mr. White's brief, and that the ALJ was not required to discuss every piece of

evidence (*id.* at pp. 10-11) As to the vocational evidence, the Commissioner asserts that the

ALJ extensively discussed Mr. White's work attempts and appropriately concluded that his

"vocational history did not overcome the weight of medical evidence or school reports." (*Id.* at

pp. 11-12) Finally, the Commissioner notes that any opinions regarding guardianship or Mr.

White's ability to perform competitive work is neither valuable nor persuasive. (*Id.* at p. 13.)

In his reply brief, Mr. White asserts that "the ALJ's analysis of the evidence omitted significant facts, which facts could well have changed the outcome of the ALJ's analysis and ultimate decision." (ECF Doc. 12, p. 1.)  In particular, Mr. White challenges the finding that he can perform work consistent with the RFC "without the support of a job coach or other supportive services" when he was unable to perform work even with such supports, and asserts that the ALJ's characterization of the supported work at Weaver Industries as competitive work was inaccurate.  (*Id.* at pp. 1-2.)  Mr. White also argues that the ALJ's analysis of the October 2019 neuropsychological evaluation failed to account for Dr. Krapf's findings regarding Mr. White's significant difficulties with adaptive functioning and need for continued supportive services, and that the ALJ erred in characterizing Dr. Krapf's opinion as supportive of an ability to perform repetitive jobs in a competitive context when the opinion was expressed in the context of a recommendation for continued job training and support from OOD.  (*Id.* at pp. 2-3.)

For the reasons set forth below, the Court finds that the ALJ's analysis of the vocational evidence contains misstatements that deprive the RFC of the support of substantial evidence because it is not clear that the ALJ fully and accurately considered the vocational records in adopting the RFC, and that the ALJ therefore failed to "build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877.

1.     **The Written Decision Mischaracterizes the Vocational Evidence**

While the substantial evidence standard is deferential, the Sixth Circuit has emphasized that the chief limitation to that deference "is the requirement that all determinations be made based upon the record in its entirety."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007) (citing *Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984)).  "This requirement that determinations be made in light of the record as a whole helps to

ensure that the focus in evaluating an application does not unduly concentrate on one single aspect of the claimant's history[.]" *Id.*; *see also* 20 C.F.R. § 404.1520(e) (findings regarding RFCs will be "based on all the relevant medical and other evidence" in the case record).

Certainly, an ALJ need not "discuss each piece of data in [his] opinion, so long as [he] consider[s] the evidence as a whole and reach[es] a reasoned conclusion." *Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006) (per curiam)). But the ALJ must perform "a proper analysis of the medical evidence under agency regulations and controlling case law," and may not "cherry-pick[] select portions of the medical record" to support his findings. *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013); *see also Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where ALJ was "selective in parsing the various medical reports"). An ALJ's reliance on a mischaracterization of fact may also deprive his findings of the support of substantial evidence. *See Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 191 (6th Cir. 2009) (finding ALJ decision lacked the support of substantial evidence where the decision was premised on "a clear mischaracterization of the facts"); *White v. Comm'r of Soc. Sec.*, 312 F. App'x 779, 787–88 (6th Cir. 2009) (finding ALJ lacked substantial evidence to support RFC after mischaracterizing evidence).

Here, the Court finds that the ALJ's analysis relies on inaccurate characterizations of the vocational evidence relating to Mr. White's participation in a sheltered work program with Weaver Industries. First, the ALJ described the sheltered work program as a "job" that Mr. White "recently obtained . . . outside of OOD, which resulted in the closure of services," contrasting that "job" to Mr. Mino's testimony regarding obstacles Mr. White faced in following up on job opportunities and completing job training. (Tr. 26 (citing Ex. 35E (Tr. 683-86).)

These findings were made in support of the ALJ's analysis and conclusion that Mr. White had no more than moderate limitations in understanding, remembering, and applying information. (*Id.*)

Second, the ALJ completed his discussion of the vocational evidence—which showed significant vocational supports and supported work activities—by describing two unsuccessful work attempts in 2022, and then explaining that the second work attempt "was very closely succeeded by [Mr. White's] application for and commencing landscaping job through Weaver Industries, where he continued to work through the day before the May 2022 hearing." (Tr. 42.) The ALJ concluded his analysis of the vocational evidence as follows:

> Ultimately, these factors relating to the documentation from the OOD and the testimony from his assigned job developer do not overcome the weight of the medical evidence or school reports and show that he would not be capable of meeting the reduced understanding and memory, sustained concentration and persistence, pace, social interactional, and adaptation-related demands of the above-listed mental limitations and without the support of a job coach or other supportive services.

(*Id.* (emphasis added))

Third, in discussing whether Mr. White had "past relevant work" that must be addressed at Step Five of the sequential analysis, the ALJ explained that Mr. White had "stopped OOD services as of May 26, 2022 contemporarily with his start of a new job *without supportive services*, as a landscaper through 'Weaver Industries,'" explaining that Mr. White had only worked at the "job" for three weeks at the time of the hearing, so it was "too early" to consider whether the job was performed at substantial gainful activity levels. (Tr. 48 (emphasis added).)

Thus, the ALJ's analysis and weighing of the vocational evidence included characterizations of the Weaver Industries program as: (1) a "job" that Mr. White "obtained . . . outside of OOD, which resulted in closure of services" (Tr. 26); (2) a "job" that Mr. White applied for and commenced shortly after an unsuccessful work attempt, which he continued to

perform at the time of the hearing (Tr. 42); and (3) a "new job *without supportive services*" that might have been considered competitive "past relevant work" if it weren't "too early" for consideration after only three weeks (Tr. 48 (emphasis added)).

But a review of the underlying vocational evidence shows that the ALJ's characterizations of the Weaver Industries program are not accurate.  When the program was first discussed with Mr. White in March 2022, it was described as a work program that did not take the place of a job.  (Tr. 668, 669.)  The purpose was to develop work experience and work-related skills.  (Tr. 602.)  Then, shortly after Mr. White started the EarthCare work program through Weaver Industries (hereinafter Weaver/EarthCare program") in May 2022 (Tr. 689), OOD issued a case closure notice which provided the following explanation:

> [Mr. White] has repetitively lost employment opportunities and has not been able to progress into community integrated employment at this time. It was recommended by both Summit Co. DD and VRC, the individual participate in the Extended Employment Work Program, EarthCare to gain further assistance on a longer term basis to gain the necessary skills to eventually transition into Community Integrated Employment. The individual felt this was a good choice and has successfully transitioned to this program for long term assistance through Summit Co. DD. The individual is aware he can reapply for OOD Services at any time. Case is closing for no longer interested in services due to participation in long term program through another agency.

(Tr. 683.)  The notice explained that the referral to the Weaver/EarthCare program was a referral "to a local extended employment provider, for example, a sheltered workshop."  (Tr. 684.)

Thus, the records clearly reflect that Mr. White transitioned to the Weaver/EarthCare program because of his noted inability "to progress into community integrated employment," with the expectation that further assistance through the Weaver/EarthCare program could help Mr. White "gain the necessary skills to eventually transition into Community Integrated Employment."  (Tr. 683.)  Mr. White's OOD services were canceled "due to [his] participation in a long term program through another agency," not because he no longer needed vocational

41

supports. (Tr. 683-84.) In other words, Mr. White's participation in the Weaver/EarthCare program reflected increased vocational supports, not the removal of supportive services, and not an example of Mr. White's ability to perform competitive work.

### 2. The Mischaracterizations of the Vocational Evidence Deprive the RFC of the Support of Substantial Evidence and Fail to Build a Logical Bridge

Having found that the ALJ mischaracterized the Weaver/EarthCare program in his discussion of the vocational evidence—by describing the program as a "job without supportive services" that Mr. White obtained after an unsuccessful work attempt—the Court must next consider whether the mischaracterizations deprive the RFC of the support of substantial evidence. Having considered the entire written decision and the evidence in the underlying record, the Court concludes that the mischaracterizations did deprive the ALJ's RFC findings of the support of substantial evidence, and also amounted to a failure to "build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877.

The record reflects that Mr. White has significant limitations in both cognition and adaptive functioning. His cognitive test results were consistently low, with a full-scale IQ score of 67 in 2019 and prior FSIQ scores of 64 in 2016, 70 in 2014, 67 in 2010, and 62 in 2007. (Tr. 705, 833, 837, 1007.) The results of cognitive and adaptative testing in 2019 showed he had "globally impaired cognitive abilities," albeit with "a relative improvement in processing speed," but that his "greatest concern" in adulthood was a "significant difficulty with adaptive functioning." (Tr. 1004.) Although the ALJ discussed this testing in the written decision, he was persuaded by medical opinions from a consultative psychological examiner who did not perform psychological testing or review any cognitive or adaptive test results (Tr. 914) and from state agency psychological consultants who considered test results from Mr. White's prior period of disability in 2016 but did not consider the cognitive or adaptive testing results from 2019.

In addition to low results on cognitive and adaptive testing, the school records show that Mr. White required substantial educational and behavioral supports throughout his schooling, including interventions in ELA, reading, vocabulary, speech, math, and behavior, which interventions were sometimes provided in core classes and sometimes in a separate classroom. (Tr. 843, 854-57, 931-32, 1115.)  Mr. White was exempted from the Third Grade Reading Guarantee due to his "significant cognitive disability."  (Tr. 935.)  His behavior during the 2019-20 school year resulted in multiple days of in- and out-of-school suspension, and finally led to his expulsion and transfer to a new high school in addition to misdemeanor convictions.  (Tr. 424-38, 1108-09, 1115.)   His IEP records consistently recognized both his significantly subaverage general intellectual functioning / significant cognitive impairments and his low or below average adaptive ability.  (Tr. 711, 722, 1118.)

The record also reflects that Mr. White received significant vocational support and assistance, both during and after high school.  Upon beginning work with a vocational counselor in 2017, he was categorized as "Most Significantly Disabled."  (Tr. 745.)  He then spent a few weeks painting fire hydrants through Summit DD in 2018, where he did a good job but took time to learn tasks, worked at his own pace, had issues staying on task, and had to be prompted to get back in the routine.  (Tr. 459, 465.)  He participated in a similar summer program in 2019.  (Tr. 420.)  There, he did not refuse tasks, made a fair amount of progress, completed tasks in a timely manner, and did well when he focused, but was not always thorough and needed consistent reminders to handle merchandise carefully and remain on task.  (*Id.*)  A vocational assessment in 2019 indicated Mr. White was "functioning at an overall moderate deficit level, suggesting a relative inability to function independently in most competitive work environments[.]"  (Tr. 483.)

To better prepare for competitive employment, it was recommended that Mr. White consider a delayed graduation program with vocational training and/or a "Work Adjustment Program," meaning a "time-limited, transitional, systematic program" to assist with vocational development.  (Tr. 490-91.)  Once he was ready for a "competitive workplace," it was suggested that Mr. White might benefit from an on-the-job training program with support from a job coach.  (Tr. 491.)  It was also recommended that Mr. White have assistance with developing pre-employment skills and receive help from a job coach in developing employment strategies and overcoming vocational barriers.  (Tr. 494-95.)

Mr. White began working with job developer Matt Mino in 2020.  (Tr. 511-12, 522.)  During the two years he worked with Mr. Mino, Mr. White submitted job applications with and without Mr. Mino's help and participated in some interviews; but he sometimes did not return messages or emails from Mr. Mino, missed some job developer meetings, and missed some job opportunities as a result.  (*E.g.,* Tr. 511, 519, 533, 541-42, 549.)  After an unsuccessful work attempt in 2020—where Mr. White struggled with computer-based learning, walked off the job, and was uncooperative and immature even with the assistance of a job coach—Mr. Mino questioned Mr. White's readiness to work in light of his behavioral issues.  (Tr. 513, 515, 516.)  Some later job opportunities were impacted by background checks showing Mr. White's misdemeanor convictions; Mr. White refused to talk with Mr. Mino about the convictions, preventing any planning as to how to address the convictions.  (Tr. 538, 553, 555, 596.)  By late-2021 and early-2022, Mr. White was putting forth little to no effort toward his job search and showed low motivation to find a job.  (Tr. 553, 555, 596, 598-99.)  It was in this context, in March 2022, that Mr. White's vocational team began looking into having Mr. White participate in the Weaver/EarthCare program during the upcoming summer.  (Tr. 635, 668, 669.)  Before

starting that program, Mr. White had another unsuccessful work attempt; his manager reported

that he had to frequently follow up and check on Mr. White, that Mr. White did a good job

unloading the truck but was unreliable and would wander off, that Mr. White had been

insubordinate and refused to do what was asked, and that Mr. White was terminated when he did

not show up to work.  (Tr. 602, 608, 689.)  Shortly after that termination, Mr. White started the

Weaver/EarthCare work program as planned.  (Tr. 683, 689.)

Although the ALJ discussed the vocational evidence at length, he found that evidence did

"not overcome the weight of the medical evidence or school reports" or "show that [Mr. White]

would not be capable of meeting the reduced understanding and memory, sustained

concentration and persistence, pace, social interactional, and adaptation-related demands of the .

. . mental [RFC] limitations and *without the support of a job coach or other supportive services*."

(Tr. 42 (emphasis added).)  But that finding may have been influenced by the ALJ's

characterization of the Weaver/EarthCare program as a "job without supportive services."  As

outlined above, the objective clinical evidence shows significant, long-term deficits in cognition

and adaptation, and the education and vocational records show continued difficulties with school

and employment attempts despite substantial support systems.  While the ALJ apparently

considered the Weaver/EarthCare program an example of Mr. White's ability to obtain and

participate in competitive work *without supportive services*, Mr. White's participation in the

program more accurately demonstrated a need for *increased* vocational supports due to a

continued lack of success in his attempts to engage in competitive work.  This apparent

misunderstanding may have been material to the ALJ's RFC findings[11] and undermines the

---

[11] The vocational expert testified that any of the following limitations—if added to the ALJ's RFC—would be work preclusive: a need for occasional redirection, difficulty following oral and written instructions, difficulty working independently, difficulty maintaining personal responsibility, difficulty remembering instructions, difficulty adhering to rules, difficulty acquiring skills to learn the task and focusing attention, difficulty doing the activity at an

"accurate and logical bridge" between the vocational evidence and the ALJ's written analysis explaining his RFC findings.  The mischaracterization was harmful error warranting remand.

Thus, for the reasons set forth above, the Court finds the RFC lacked the support of substantial evidence and the ALJ failed to build a logical bridge between the evidence and the result.  Accordingly, the Court remands the decision for further proceedings consistent with this opinion and order.[12]

### VII.    Conclusion

For the foregoing reasons, the Court **VACATES AND REMANDS** the Commissioner's final decision, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this opinion and order.  On remand, the ALJ should consider the entire record relating to Plaintiff's mental impairments, including the medical, educational, and vocational records, should accurately discuss the evidence, and should ensure that his rationale builds an accurate and logical bridge between the evidence and the result.

February 6, 2025

/s/Amanda M. Knapp
AMANDA M. KNAPP
United States Magistrate Judge

---

acceptable rate, difficulty doing quality work, and/or difficulty with self-control with predictable behavior.  (Tr. 96, 100-01.)

[12] Because the Court finds that remand is warranted based on the ALJ's mischaracterization of the vocational evidence, it need not address Mr. White's additional arguments regarding mistakes or omissions allegedly made by the ALJ when analyzing other parts of the evidentiary record.